In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-24-00126-CR
_____

RECARIDO ANTONIO TERRELL, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. F22-40391**

_____

**MEMORANDUM OPINION**

A jury found Recarido Antonio Terrell ("Terrell") guilty of the offense of aggravated assault with a deadly weapon and assessed punishment at forty years imprisonment. *See* Tex. Penal Code Ann. § 22.02. The trial court sentenced him accordingly. On appeal, Terrell challenges his conviction and argues the evidence is legally insufficient to support his conviction. He also challenges the admission of alleged extraneous offenses presented during the punishment phase. Having

1

determined that the trial court did not abuse its discretion in admitting evidence of Terrell's extraneous offenses and that the evidence is legally sufficient to support Terrell's conviction, we affirm the trial court's judgment.

## Background

On July 13, 2022, Terrell was indicted for aggravated assault with a deadly weapon for causing bodily injury to Casey,[1] a person with whom he had a dating relationship, by shooting Casey in the leg. On March 11, 2024, Terrell's trial began. The State called William John Bessey, who testified that on July 13, 2022, he was at work at Ohmstede, Limited in Beaumont, Texas. He stated that around 11:00 p.m., while inside the shop, he heard a woman screaming across the street. He explained that he checked, and the woman appeared to be in distress and said she needed the police, so he called 911. Bessey described the woman as middle-aged, African American. He said that while he was on the phone with 911, the woman indicated that she had been shot by her boyfriend near the freeway. Bessey's call to 911 was admitted as evidence and played for the jury.

Bessey testified that the woman was barefoot and said that she jumped out of her boyfriend's red vehicle. Bessey stated that the police and EMS arrived, and he

---

[1]We refer to the victim by a pseudonym to conceal her identity. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[]").

spoke with law enforcement. Bessey testified that later he gave a full statement that was consistent with his testimony at trial. Bessey stated that he never saw Terrell or the red vehicle around his jobsite. According to Bessey, his employer is the only business in that area of downtown.

Next, Connor Davis Rushing, an employee with Beaumont Fire & EMS testified that he responded to a call from dispatch regarding a shooting at 690 Harrison Avenue in Beaumont, Texas on July 13, 2022. Rushing testified that he made contact with Casey, the person in need of medical attention, and observed abrasions to her arm, right leg, and face, along with a gunshot entry and exit wound to her right leg/buttock area. He stated that Casey's abrasions were consistent with road rash caused by jumping out of a moving vehicle. He believed that the gunshot wound was an entry and exit wound and was consistent with someone who had been shot with a firearm. Rushing stated that a firearm is capable of causing death or bodily injury and is considered a deadly weapon.

According to Rushing, Casey stated that she was in the car with her boyfriend when she was shot in the leg and she jumped from the vehicle, ran, and found refuge at the shop where EMS located her. Casey was then transported to the hospital, and Rushing prepared his report. Rushing testified that Casey's abrasions were consistent with someone jumping out of a car, but he did not see Terrell or a red

3

vehicle at or near the scene. Though Casey reported a boyfriend, Rushing did not know how many boyfriends Casey had.

Randall Craig Dommert, criminal investigator with the Jefferson County District Attorney's Office, testified that he secured witnesses for trial. Dommert said that he contacted Officer Cody Hussey with the Beaumont Police Department regarding his availability for trial the week before, and Hussey indicated he was available. Dommert explained that he contacted Officer Hussey the day before trial, who indicated that he was sick and unavailable for his work shift the night before due to his illness. Dommert stated that he had no reason to doubt Officer Hussey's representation.

The trial judge found that Officer Hussey was unavailable, and a transcript of Officer Hussey's testimony given in September 2023 and Hussey's body camera video from the night of the incident were admitted as evidence, read and published. A portion of Hussey's testimony was read where Hussey stated that he arrived on the scene at 11:00 p.m., and Casey reported that she was riding in the passenger vehicle on Interstate-10. Hussey testified that Casey reported that Terrell, her ex-boyfriend, shot her. Hussey stated that Casey said that she and Terrell were arguing in the car when she attempted to jump out after she saw a gun by Terrell's side, but Terrell demanded that Casey close the door. Hussey testified that Casey said that

4

Terrell then struck her in the back of the head a few times with the gun and shot once into the floorboard. Hussey stated that Casey said, "[S]he risked it and jumped out of the vehicle[]" and ran to the center median to look for help. Hussey testified Casey stated that Terrell followed her to the center median, they got into a brief struggle, and Terrell shot her once in the right leg. A portion of the cross-examination of Hussey was read also wherein Hussey stated that someone who jumped out of a car at seventy-five miles per hour would be injured and have "pretty bad" rash. Hussey further confirmed that Casey stated that the incident involved her ex-boyfriend, and she was shot once in the right leg.

The trial court admitted Hussey's body camera video from the night of the incident as evidence, and it was played during trial. In the video, officers are speaking with Casey, and she names Terrell and states that he was driving a red vehicle. The video also shows officers discussing that Casey related that while in the car, Terrell shot towards her foot and hit her in the head with a gun, and Casey jumped out of the car. An officer can be heard on the video stating that Terrell had threatened to kill Casey, shot at her twice, and one bullet struck her leg.

Dommert also testified that he attempted to secure the presence of Detective Mary Phillips, but she said that she was unavailable due to a medical appointment in Houston. At the State's request, the trial court admitted Detective Phillips's

5

testimony from September 2023. Additionally, an audio recording of Phillips's phone call with Terrell was admitted as evidence and played for the jury. On the call, Terrell denies shooting Casey and states that he last saw Casey the day before, on his lunch break around 12:30 p.m.

Officer Craig Tyler Murphy, a patrol officer with the Beaumont Police Department, testified that on July 14, 2022, he was dispatched to a house fire at 3734 Hebert Alley, Beaumont, Jefferson County around 2:30 a.m. Murphy testified that the home was "completely engulfed" when he arrived, and a red vehicle with power lines lying on top was parked close to the front of the home. The vehicle had a Texas buyer's tag, and Murphy noticed a bullet hole in the front passenger door. Murphy explained that the bullet hole "looked more like an exit like if a shot was fired from inside the vehicle." With the help of dispatch, Murphy testified that he determined that the water bill at the home was in the name of Casey, and the vehicle was registered to Terrell. Photos of the scene were admitted as evidence. Murphy testified that the vehicle was towed, because they believed it was involved in an earlier aggravated assault.

According to Murphy, he believes that jumping out of a car going seventy-five miles per hour would result in road rash and injury, depending on how you landed. He testified that the vehicle was parked close to the house at a weird angle

like someone parked in a rush. He did not see Terrell at the scene and did not know how long the bullet hole had been in the door. He testified that he did not know how long the vehicle was parked there.

Next, Aaron Lewallen, Detective with Beaumont Police Department, testified that he is trained in analyzing cellphone data. He described how the analysis works and how cellphone towers are used to provide "a general location" of a cellphone. He explained that he conducted an analysis of the data for cellphone numbers ending in 3636 and 2568. He was also provided with certain addresses in Port Arthur and Beaumont, including 3734 Hebert Alley. Lewallen testified that the analysis revealed that both cellphones were in the area of 3734 Hebert Alley at 7:30 p.m. on July 13, 2022. The analysis further confirmed that the cellphones were around the Port Arthur addresses that same day around 8:30 p.m., and both were traveling on Interstate-10 in Beaumont around 10:30 p.m. Lewallen testified the data showed that the cellphone ending in 2568, the defendant's cell phone, was in the area of 3734 Hebert Alley at 1:48 a.m. on July 14.

Lewallen testified that he is positive that the program used to provide the cellphone data was operating properly. The data does not provide the identity of the person or persons travelling with the cellphones. Photos of the cellphone data with map shading were admitted as evidence.

Lewallen stated that he would probably be severely injured if he jumped out of a car traveling seventy-five miles per hour. He testified that the mapping of the cellphone data has overlapping of both cellphones, and that suggests that the two cellphones were within the sectors of the cell tower. Lewallen did not know who lives at the address in Port Arthur where data of one cellphone indicated it had been. He believed that the cellphone number ending in 3636 belonged to Casey, but he did not verify that information with the phone company.

Next, Casey testified that she was thirty-two during trial and lived in Beaumont. She identified Terrell as a former boyfriend of about three years. She said that on July 13, 2022, she lived at 3734 Hebert Alley, and Terrell lived with her on and off. She stated that on that day, she went to look at two homes, including one in Port Arthur. Terrell called her about 6:30 or 7:00, and they met at Family Dollar on Avenue A. She recalled Terrell driving a red vehicle, and he followed her to look at the first house. Casey said that afterward, she got in Terrell's vehicle, and they went to Port Arthur. She stated that they did not go to the home on Hebert Alley.

According to Casey, around 11:00 p.m. she and Terrell were back in Beaumont and traveling on Interstate-10 eastbound near downtown. She said that Terrell was on the phone and when he ended the call, he pulled out a pistol and said, "[B]itch, I'm about to kill you." Casey stated that Terrell said that she told "some

8

drug dealers about some drugs[,]" but she denied knowing what Terrell was talking about. She said that Terrell said, "[W]ell, I'm about to hurt you. I'm about to kill you." She stated that Terrell shot the pistol while she begged him not to hurt or kill her. During this time, Terrell had fired the pistol and was still driving, and Casey stated that she jumped out of the car and as a result, she hit her "head on the bank." She added that the bank was concrete. She did not know how fast they were traveling when she jumped out of the car, but it felt like seventy-five miles per hour to her. Casey denied any involvement in the sale or distribution of illegal narcotics or controlled substances and stated that she worked two jobs.

Casey testified that after she jumped out of the car, Terrell swerved over, got out, and tried to fight with her and said, "Bitch, you coming with me." She stated that she responded she was not leaving with him, and Terrell said, "[B]itch, give me your phone…if you don't come with me, I'm going to finish you off." Casey said that Terrell had already shot her in the leg, but she "took off" towards downtown and hid in ditches. She stated that Terrell chased her for a little while but returned to his car and left.

Casey testified that she was barefoot and ran towards a garage and yelled for help and that she had been shot. She stated that a man at the business said for her to "come over here[,]" but she declined because Terrell was looking on the loose and

9

had threatened to finish her off. The man called the police and ambulance, and both arrived about five minutes later. She said that she provided information about who shot her and the vehicle to the man while he was on the phone with 911, and he passed along the information. When police arrived, she provided the same information to police and EMS attendants, along with cellphone information. Casey stated that she also spoke with Detective Phillips the next day and told her who shot her and the manner it happened. It was the same story.

Casey testified that she was taken to the hospital and treated for a gunshot wound in her hip, and the bullet exited her buttocks. She also sustained injuries to her foot and head and had road rash on her arm and side. She said that she felt pain when she was shot and jumped out of the car, and she still has scars and injuries. She stated that Terrell shot her with a handgun, and she was afraid for her life.

Casey testified that she could not return to her house because it burned down several hours later, which was the next morning. She stated that she was released from the hospital around 3:15 a.m. While she was at Walgreen's getting her medicine, a detective contacted her and told her that her house had burned down, and a red vehicle was in the yard. She later arrived at her home and was able to go inside. She said that she was suspicious after she noticed that her 75-inch television,

washer, dryer and another television were missing, and it appeared someone took the items before the fire.

Casey testified that there was no reason for Terrell's vehicle to be at her home less than three hours after he shot her. She stated that while her home did have electrical problems in the past that caused the lights to flicker, it never caused a fire. Casey identified photos previously admitted as evidence and stated that the car that she was shot in is shown in front of her burned home with a bullet hole in the passenger door.

Casey reiterated that there was no reason for the vehicle to be at her home and that Terrell was not living in her home at that time. Photos of Casey's injuries were also admitted as evidence and Casey described the injuries. Casey confirmed that Terrell caused her injuries. Casey later explained that her injuries were the result of her getting out of the vehicle and that Terrell did not hit her. She stated that she jumped out of the vehicle because Terrell had a handgun, she feared for her life, and Terrell had shot her and was going to kill her.

Casey testified that her cellphone number ends in 3636 and though she could not recall the last four digits of Terrell's phone number, it was area code 769. Casey stated that cellphone records showing the two numbers in the same area would reflect her and Terrell being together that day. A video recording of Casey and Terrell

11

meeting at Family Dollar was admitted as evidence and Casey said that the video showed her arriving at Family Dollar and Terrell arriving in his red vehicle around 7:30 p.m.

Casey admitted that she had no hard forensic evidence that Terrell was an arsonist or thief. She did not know who all went inside her home after it burned. She stated that if cellphone data suggested that she was on Interstate-10 heading to Houston, that would be wrong because she was headed towards Lake Charles, and she exited the vehicle near Willow Street. She agreed that cellphone data provided the general area, and it is possible that the data provided included their location area when they returned from Port Arthur.

Following deliberations, the jury found Terrell guilty of aggravated assault and the punishment phase commenced.

The first witness during punishment, Troy Robinson, an investigator with the Jefferson County District Attorney's Office, testified that he is a fingerprint expert and that the fingerprints on Terrell's Jefferson County booking fingerprint card matched the fingerprints in the documents from the state of Mississippi. Robinson stated that additional matching identifying information included Terrell's social security number, name, date of birth and photo. Robinson testified that he has no doubt that the person convicted in Mississippi is Terrell. The certified records from

Mississippi confirmed that Terrell was convicted of burglary twice in 1996, auto theft in 1996, burglary in 1997, robbery in 2005, possession of marijuana in 2008, and possession of contraband in prison in 2010. Robinson testified that the records indicated that Terrell was sentenced to fifteen years in prison for the 2005 robbery and three years in prison for possession of contraband in prison. Robinson stated that the convictions are all felony convictions. Robinson testified that the records indicated that Terrell possessed 109.5 grams of marijuana, and the contraband he possessed in prison was a cellphone.

Next, Robert Gerard, a police officer with the Beaumont Police Department, testified that on January 4, 2022, he and his partner were on patrol in the north end of Beaumont. Gerard said that they stopped a vehicle driven by Terrell, and he identified Terrell in the courtroom. Before making contact with Terrell, Gerard testified that Terrell did not immediately pull over after his lights were activated, and this typically indicates that the person is trying to conceal something or will flee. However, Terrell eventually stopped, and he observed Terrell throw what he initially believed to be crack cocaine out of the driver's side window. Terrell was the only person inside the vehicle. Another officer, Sergeant Simpson, recovered the items that Terrell discarded on the ground, and it was pills. Gerard testified that they

13

searched the vehicle, and they recovered another pill and a small amount of marijuana.

Gerard testified that Terrell was removed from the vehicle, and he was nervous, shaky, and fell to the ground. EMS was called to the scene, and Terrell was transported to the hospital but ultimately cleared and sent to jail. Terrell was arrested for felony possession of a controlled substance. Footage of Gerard's body camera on the day of Terrell's arrest was previously admitted as evidence and played for the jury. Gerard testified that at the time of trial, he did not know if Terrell had been convicted of possession of the items. Terrell did not advise Gerard of any medical issues when he fell to the ground.

Sergeant Deron Simpson with the Beaumont Police Department testified that he was working with Gerard on January 4, 2022, when they initiated a traffic stop with Terrell. Simpson observed Terrell throw something out of the window and he later recovered the pills that were thrown. Simpson said that the pills were oxycodone hydrochloride, and it is a criminal offense to possess the pills without a prescription. Simpson stated that he was wearing a body camera that day, and the video of Simpson's body camera was admitted as evidence and played for the jury. Simpson did not know if Terrell was convicted for possession of the pills.

Marsha Cox, Jefferson County Regional Crime Lab analyst, testified that she determined that the pills that Terrell possessed were anilino and phenethylpiperdine (ANPP) and fentanyl. She stated that fentanyl is a Penalty Group 1B controlled substance, and that possession of it is a felony. She did not know if Terrell was convicted of possession of any controlled substance.

Finally, Devin Stelly, a deputy at the Jefferson County Correctional Facility, testified that on December 17, 2023, he was assigned to the dorm where Terrell was housed with other inmates, and after being suspicious of Terrell's bedding, he conducted a search of his bunk and located an improvised weapon. He described the weapon, commonly referred to as a shank, as a long piece of metal, sharpened on one end, and wrapped on the other end. Stelly said that the shank is a violation of jail policy and Texas law and is a prohibited item. He stated that he also found an improvised tattoo gun, another prohibited item.

The jury sentenced Terrell to forty years imprisonment.

On appeal, Terrell argues the trial court erred when it allowed evidence of extraneous acts during the punishment phase of trial, and he challenges the legal sufficiency of the evidence supporting his conviction. In issue two, Terrell argues that the evidence is legally insufficient to prove that Terrell committed the offense of aggravated assault. Although Terrell states in his brief that the evidence was

15

legally insufficient in six areas, Terrell only argues that the accuser did not testify at trial and was therefore not available for cross-examination in front of the jury. Terrell adds that the evidence only demonstrates that he was in the area but not involved in the aggravated assault. We address Terrell's sufficiency challenge first, since if meritorious, it would entitle him to rendition and judgment of acquittal. *See Benavidez v. State*, 323 S.W.3d 179, 181 (Tex. Crim. App. 2010) (explaining that insufficient evidence to support a conviction can render an acquittal); *O'Reilly v. State*, 501 S.W.3d 722, 726 (Tex. App.—Dallas 2016, no pet.).

## ISSUE TWO: SUFFICIENCY OF THE EVIDENCE

### Standard of Review and Applicable Law

When there is a challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 899, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The factfinder is the sole judge of the witnesses' credibility and weight to be given to their testimony. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). Factfinders may draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial.

16

*Id*. We must defer to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the jury resolved such facts in favor of the verdict and defer to that resolution. *Brooks*, 323 S.W.3d at 899 n.13 (citations omitted); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In addition, we determine whether the necessary inferences are reasonable based on the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778.

The Penal Code states that a person commits assault if he intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse; intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative. Tex. Penal Code. Ann. § 22.01(a). Section 22.02 of the Texas Penal Code provides that a person commits an offense of aggravated assault if he commits assault as defined in section 22.01 and causes serious bodily injury to another or uses or exhibits a deadly weapon during the commission of the assault. *Id.* § 22.02(a).

## Analysis

The indictment in this case alleged that Terrell "did then and there intentionally and knowingly and recklessly cause bodily injury to [Casey] … by the use of a deadly weapon, namely, a firearm, by shooting [Casey] in the leg." Terrell argues that the accuser did not provide live testimony and was not cross-examined, and he challenges the evidence confirms his presence in the area but not his involvement.

The record confirms that Casey testified in-person and was cross-examined by Terrell's attorney on day two of trial. Casey testified that she and Terrell were together on the day she was shot, and they travelled together to Port Arthur to look at a house. She stated that while in the car, Terrell got a phone call and when he hung up, he pulled out a pistol and threatened to kill her. Casey testified that Terrell accused her of talking to drug dealers, threatened to kill her, and shot her with his pistol after she jumped out of his vehicle. She testified that she got out of the moving vehicle while they traveled on Interstate-10, and in addition to her gunshot wound, she suffered abrasions and road rash on her feet, legs, arm and head.

In addition to Casey, two other witnesses that encountered Casey that night, Bessey and EMT technician Rushing, both testified that Casey indicated to them that she jumped out of Terrell's car and he shot her. Additionally, the testimony of

18

Officer Hussey and his body camera video from the night of the incident also shows that Casey related the same story to him about her injuries.

Also at trial, a cellphone data analyst testified that records indicated that Casey's and Terrell's phones were together from approximately 7:30 p.m. to 10:30 p.m., though he conceded that he was unable to determine who was in possession of the cellphones during that time. He testified that he is positive that the program used to provide the cellphone data was operating properly.

While the evidence does not demonstrate who was in possession of Terrell's cellphone when records indicated that his phone and Casey's cellphone were in the same area at the time of the incident, the cellphone records along with Casey's testimony of the incident permitted the jury to reasonably infer that Terrell committed the aggravated assault against Casey. *See Tate*, 500 S.W.3d at 413; *Hooper*, 214 S.W.3d at 13. Viewing all the evidence in the light most favorable to the jury's verdict, we conclude the jury could have reasonably determined that Terrell and Casey were in the vehicle together and that Terrell committed the charged offense. *See Brooks*, 323 S.W.3d at 899, 912; *Hooper*, 214 S.W.3d at 13. We overrule issue two.

**ISSUE ONE: ADMISSION OF EXTRANEOUS OFFENSE EVIDENCE**

We now turn to Terrell's first issue, in which he argues that the State failed to prove he committed the extraneous offenses that were presented to the jury during the punishment phase. Terrell also argues that the probative value of admitting the extraneous offenses was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misled the jury.

**Standard of Review and Applicable Law**

We review the trial court's decision to admit evidence of extraneous offenses for an abuse of discretion. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009) (citation omitted); *Moses*, 105 S.W.3d at 627. Generally, when challenged on appeal, a ruling admitting evidence of extraneous offenses will be found to fall within the zone of reasonable disagreement "if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *De La Paz*, 279 S.W.3d at 344. If a trial court's evidentiary ruling is correct under any applicable theory of law, we do

not disturb it even if the trial judge articulates an incorrect reason for the correct ruling. *Id.*

The Code of Criminal Procedure permits evidence of a defendant's prior criminal record after a finding of guilty. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3. "To establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction." *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). While there is no "best evidence" rule or substantive law that a prior conviction be proven in a specific manner, "evidence of a certified copy of a final judgment and sentence may be a preferred and convenient means[]" though other methods such as a defendant's admission, testimony of a witness to a defendant's conviction who can identify the defendant, or documentary proof with sufficient identifying information are other options. *Id.* at 921–22.

**Analysis**

During the punishment phase, the trial court admitted as evidence Terrell's booking record from Jefferson County that included Terrell's fingerprints, photograph, social security number, date of birth, and other identifying information. Next, the trial court admitted certified records, commonly referred to as a "pen packet," from the State of Mississippi Department of Corrections detailing the

21

convictions of a person bearing the same name,[2] social security number, and date of birth as Terrell. Before the admission of the evidence, Terrell objected and argued that the pen packet was not properly authenticated because there were no authenticating fingerprints and because certified copies from the State of Mississippi do not satisfy the authenticity required for the State of Texas.

On appeal, Terrell argues that the State did not prove that Terrell committed the offenses presented to the jury during the punishment phase of trial. We will first consider the evidence of Terrell's prior convictions in Mississippi. Here, the State provided documents of Terrell's prior convictions in Mississippi that were not only certified and notarized by the Mississippi Department of Corrections, but the documents also included identifying information such as fingerprints of Terrell. Investigator Robinson testified that he is a certified fingerprint expert and that he compared the fingerprints on Terrell's Jefferson County booking fingerprint card to the fingerprints in the pen packet from the state of Mississippi. Robinson concluded that the fingerprints were the same, along with the other identifying information such as name, social security number, date of birth, and photo. We therefore conclude that

---

[2]Terrell's first name is spelled differently in the Mississippi records; however, Terrell's signature on his employment records, and the Mississippi and Texas records is spelled as we spell it herein.

the evidence effectively demonstrated that Terrell had a criminal record, including prior felony convictions, in the State of Mississippi.

Terrell also challenges the admission of evidence of an arrest and Terrell's possession of a prohibited item in the Jefferson County Correctional Facility. To preserve error to the admission of extraneous offenses, the defendant must first timely object that the evidence is inadmissible under Rule 404(b) of the Texas Rules of Evidence and the objection must include the legal basis for the objection. Tex. R. App. P. 33.1(a). A review of the record confirms that Terrell did not object to evidence of his arrest or possession of a prohibited item. To present a complaint for appellate review, the record must show that a timely complaint or objection was made to the trial court and the trial court ruled on the matter. *See id.* Because the record does not reflect that Terrell objected to the evidence, Terrell failed to preserve any error on this issue.

Finally, Terrell argues that the probative value of the extraneous offenses was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading of the jury. Rule 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of" any one of the following: "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Again, the record

does not reflect that Terrell made a Rule 403 objection at trial when the challenged extraneous offense evidence was offered at trial, and he has failed to preserve this issue on appeal. *See Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) (explaining that objection on appeal must comport with objection made at trial); *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003) (explaining that the rules generally require a timely, specific complaint); *Smith v. State*, No. 09-17-00302-CR, 2019 WL 1270817, at \*6 (Tex. App.—Beaumont Mar. 20, 2019, no pet.) (mem. op., not designated for publication) (concluding that where appellant failed to make 403 objection, he did not preserve error; *see also* Tex. R. Evid. 403; Tex. R. App. P. 33.1(a)(1)(A). Having considered all of Terrell's arguments, we overrule issue one.

## Conclusion

Having overruled each of Terrell's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on December 30, 2025
Opinion Delivered May 27, 2026
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.

24